UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

In the Matter of the Complaint of    )
   )
BOAT AARON & MELISSA, INC., as owner  )
of the F/V EMMY ROSE (O.N. 909149), a 80' )    No. 2:21-cv-0001-JAW
fishing vessel, for Exoneration from, or   )
Limitation of Liability   )

## ORDER

Following the tragic deaths at sea of four seamen, the vessel owner and the estates of the seamen submit a stipulated record to the court for the allocation of damage awards under the Death on the High Seas Act and the Jones Act and the vessel owner seeks an exoneration of the vessel owner under the Limitation of Shipowner's Liability Act. In this order, the Court exonerates the vessel owner, fixes an equal amount of conscious pain and suffering damages for the estates of each seaman, determines which minor children are entitled to minor support and loss of nurture awards (and for how long) and makes those awards, decides what claimed expenses are properly deemed funeral expenses, and makes an equitable allocation among damages categories in light of the limited available insurance coverage.

## I.     BACKGROUND

On November 23, 2020, F/V Emmy Rose, an 82-foot, steel-hulled fishing vessel (the Vessel) sank in the Atlantic Ocean on the way to Gloucester, Massachusetts. *Joint Stips. for Allocation of Ins. Proceeds* ¶¶ 1, 3, 7 (ECF No. 48) (*Joint Stip.*). All four crew members aboard the Vessel were lost and are presumed drowned. *Id.* ¶¶ 4, 12. The United States Coast Guard (USCG) conducted a thirty-eight-hour search

but suspended its search on November 24, 2020. *Id.* ¶ 11. The USCG later issued a Presumption of Death letter for each of the four men, identifying November 23, 2020 as the date of death. *Id.* ¶ 12. On May 21, 2021, the Vessel was located on the bottom of the ocean northeast of Provincetown, Massachusetts and it has not been raised. *Id.* ¶ 13.

This civil action was commenced to allocate a settlement fund among the representatives and survivors of the lost crew members. *See In re Compl. of Uncle Sam of '76, Inc.*, 928 F. Supp. 64, 65 (D. Mass. 1996). The parties, including the owner and operator of the Vessel, Boat Aaron & Melissa, Inc. (BAM), agree that the total amount of available insurance proceeds is $960,000. *Notice of Amount of Ins. Proceeds* (ECF No. 50). Rather than request a testimonial hearing before the Court, the parties agreed to present submissions about the decedents, their families, and their pecuniary losses. *See Uncle Sam*, 928 F. Supp. at 66 ("The commitment of resources to a full evidentiary hearing would have dramatically reduced the already limited settlement fund available for distribution").

## II.    LEGAL PRINCIPLES

### A.    The Limitation of Shipowner's Liability Act

Under 46 U.S.C. § 30511(a), the Limitation of Shipowner's Liability Act, the "owner of a vessel may bring a civil action in a district court of the United States for limitation of liability[.]" 46 U.S.C. § 30511(a); *see* FED. R. CIV. P. F (limitation of liability). Pursuant to 46 U.S.C. § 30505(a), the "liability of the owner of a vessel for any claim . . . shall not exceed the value of the vessel and pending freight." 46 U.S.C.

2

§ 30505(a).  However, claims under subsection (a) of § 30505 "are those arising from . . . any loss, damage or injury . . . done, occasioned, or incurred, without the privity or knowledge of the owner."  46 U.S.C. § 30505(b); *see In re Parham*, 336 F. Supp. 748, 751 (E.D. Ark. 1971).  Here, in its Complaint, BAM alleged that "[a]t all material times prior to its casualty, the Vessel, its appurtenances and crew were seaworthy, tight, staunch, strong and fit" and that "the Vessel and its appurtenances were operated and utilized in a seaworthy fashion."  *Compl.* ¶¶ 10, 15 (ECF No. 1).

### B.    The Claim for Exoneration or Limitation

On July 7, 2021, the parties to this action proposed a procedural order in which they agreed that the Court should enter a Consent Judgment "capping Plaintiff, its officers, directors, employees, Bartley McNeel, Newbold Rick Varian, III, and agents liability to the value of the Plaintiff's protection and indemnity insurance policy limits less any erosion."  *Joint Suppl. to Proposed Procedural Order* at 1 (ECF No. 36).  The proposed procedural order requested that the Court should "allocate the remaining value of the Plaintiff's protection and indemnity insurance policy limits to the Claimants."  *Id.*  On July 12, 2021, the Court approved the proposed procedural order. *Procedural Order* (ECF No. 37).  On October 8, 2021, the parties filed a set of joint stipulations containing the agreed-upon language for release of BAM, its officers, directors, employees, and agents.   *Joint Stip.* ¶¶ 21-22.   Based on the parties' agreements, the allegations in the Complaint, and the Court's approval of the proposed procedural order, the Court concludes that the Plaintiff sustained its claim for exoneration or limitation of liability.  *Compare In re Cape Fear*, 183 F. Supp. 2d

228, 282 (D. Mass. 2001) (finding the owner of the vessel failed to sustain its claim following a trial on its petition for exoneration from or limitation of liability).

### C. Admiralty Jurisprudence

"A central tenet of admiralty jurisprudence is that seamen are wards of admiralty." *Uncle Sam*, 928 F. Supp. at 66 (citing *Robertson v. Baldwin*, 165 U.S. 275 (1895)). "The concerns of admiralty for protection of its wards extends also to protecting the legal rights of a seaman's survivors and dependents when the seaman is lost at sea." *Id.* "Thus, a district court sitting in admiralty has discretion at least, if not an obligation, to take reasonable steps to ensure that the survivors and dependents of a seaman lost at sea receive a fair share of limited settlement funds available to provide support for many claimants." *Id.* "Under both the Jones Act and the Death on the High Seas Act (DOHSA), recoverable damages are limited to (1) an award for the conscious pain and suffering of the decedent before his death, and actual pecuniary loss of the survivors as a result of his death." *Id.* at 65 (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990)) (emphasis in original).

Each claimant demands an award for the conscious pain and suffering of the decedent before his death. *Written Submission of Jeffrey Matthews, Jr., as Personal Representative of the Estate of Jeffrey Matthews, Sr., deceased, Claimant, Pertaining to Allocation of the Ct.'s Consent J.* at 4-7 (ECF No. 49) (*Matthews Mem.*); *Consent J. Mem. on Damages of Pl. Ann Preble, as the Representative of the Estate of Robert Blethen, Jr.* at 4-5 (ECF No. 52) (*Blethen Mem.*); *Pl.'s, Ashley Gross as the Representative of the Estate of Michael J. Porper, Jr., Consent J. Hr'g Mem.* at 10-11

(ECF No. 55) (*Porper Mem.*); *Claimant Jennifer Ward and Matthew Ward's Written Submission Regarding Allocation of Ins. Proceeds* at 4 (ECF No. 57) (*Ward Mem.*). Mr. Matthews and Mr. Ward filed replies. *Rely Br. of the Estate of Jeffrey Matthews, Sr.* (ECF No. 59) (*Matthews Reply*); *Reply Br. by Claimant Jennifer Ward and Matthew Ward* (ECF No. 60) (*Ward Reply*).

DOHSA allows for recovery of pecuniary losses only. 46 U.S.C. § 30303 ("The recovery in an action under this chapter shall be a fair compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought"). However, as the decedents were seamen, their Estates are also entitled to recovery under the Jones Act. 46 U.S.C. § 30104. The Jones Act "does not apply a pecuniary loss restriction to the injuries of a decedent himself. On the contrary, a decedent's beneficiaries are able to recover damages for any type of injury or loss which the decedent sustained during the time that he was conscious prior to his death." *Cook v. Ross Island Sand & Gravel Co.*, 626 F.2d 746, 749 (9th Cir. 1980); *see McAleer v. Smith*, 791 F. Supp. 923, 926-29 (D.R.I. 1992).[1]

Pecuniary loss under DOHSA includes "the monetary value of services the decedent provided and would have continued to provide but for his wrongful death." *Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 585 (1974). "Such services include, for

---

[1]     In 1990, the First Circuit held that "there is a federal maritime survival action, created by decisional law, for pain and suffering prior to death." *Barbe v. Drummond*, 507 F.2d 794, 799 (1st Cir. 1974). Whether there is such a federal maritime action was discussed but not resolved in *Miles*. *Miles*, 498 U.S. at 33-34. However, in *Dooley v. Korean Air Lines Co.*, 524 U.S. 116 (1998), the United States Supreme Court ruled that in enacting the DOHSA, "Congress provided the exclusive recovery for deaths that occur on the high seas." *Id.* at 123; *see Santos v. Am. Cruise Ferries, Inc.*, 100 F. Supp. 3d 96, 107 (D.P.R. 2015).

example, the nurture, training, education, and guidance that a child would have received had not the parent been wrongfully killed." *Id.*

Thus, all told, pecuniary loss under DOHSA includes the "loss of support, loss of services, funeral expenses, and loss of nurture and guidance to the decedent's children." *In re Adventure Bound Sports*, 858 F. Supp. 1192, 1197 (S.D. Ga. 1994). Here, three claimants have made claims for loss of support and loss of nurture and guidance for minor children, and one claimant for funeral expenses. *Matthews Mem.* at 3 ("Mr. Matthews had three adult children but no minor children"); *Blethen Mem.* at 3-4; *Porper Mem.* at 7-10 (Mr. Porper's "family is entitled to recover for his funeral expenses at approximately $10,000"); *Ward Mem.* at 4-9.

Although each parent had a support obligation for his minor children, one question raised by the parties is how long the support obligation lasts. The resolution of this question involves both Maine and Massachusetts law. All but one of the decedents' minor children lived in Maine; the one exception lived in Massachusetts. *Blethen Mem.* at 1-2; *Porper Mem.* at 1; *Ward Mem.* at 8-9. Under Maine law, a parent's support obligation typically ends when the child attains eighteen years of age; however, if the child is still in secondary school, a support order "remains in force until the child graduates, withdraws or is expelled from secondary school or attains 19 years of age, whichever occurs first." 19-A M.R.S. § 1653(12)(A)[2]; *see Melanson v. Belyea*, 1997 ME 150, 698 A.2d 492. Massachusetts law is similar but slightly more complicated and liberal. *See LaBrecque v. Parsons*, 74 Mass. App. Ct. 766, 910 N.E.2d

---

[2]     Maine law also provides that the parental support obligation terminates when the minor marries or becomes a member of the armed services. 19-A M.R.S. § 1653(12)(B)-(C).

947 (Mass. App. Ct. 2009).  A Massachusetts court may award support for a child who is eighteen or older but not yet twenty-one if the child "is domiciled in the home of a parent, and is principally dependent upon said parent for maintenance."  MASS. GEN. LAWS ch. 208, § 28.  A Massachusetts court is also empowered to order child support for a child who is twenty-one or older but not yet twenty-three, if the child "is domiciled in the home of a parent, and is principally dependent upon said parent for maintenance due to the enrollment of such child in an educational program, excluding educational costs beyond an undergraduate degree."  *Id.*

## III.    THE CLAIMS OF THE SEAMEN AND SURVIVORS

### A.    Generally Applicable Facts

The record reveals facts generally applicable to each seaman aboard the F/V Emmy Rose and the circumstances of the sinking.  Aboard the F/V Emmy Rose at the time of its sinking were Captain Robert Blethen and crewmen Jeff Matthews, Sr., Michael Porper, and Ethan Ward.[3]  *Joint Stip.* ¶ 4.  The F/V Emmy Rose was an 82-foot ground fishing vessel home ported in Portland, Maine.  *Id.* ¶¶ 1-3.  The F/V Emmy Rose departed Portland on a fishing trip on November 18, 2020.  *Id.* ¶ 6.  During the evening hours of November 22, 2020, the crew of the Vessel communicated with various individuals on shore that the Vessel was headed to Gloucester, Massachusetts to unload its catch.  *Id.* ¶ 7.  At approximately 0130 hours on November 23, 2020, the F/V Emmy Rose's Emergency Position Indicating Radio

---

[3]    Even though each seaman is deceased and is appearing in court in various capacities, to simplify the language of this opinion, the Court refers to each claimant by the name of the deceased, rather than the personal representatives of the respective estates or the legal representatives of their children.

Beacon (EPIRB) emitted an emergency ping in the Atlantic Ocean approximately 27 nautical miles northeast of Provincetown, Massachusetts. *Id.* ¶ 8. According to the National Oceanic and Atmospheric Administration Buoy Number 44018, the buoy closest to the EPIRB signal, weather conditions at the time of the signal were: air temperature of 48.2 degrees Fahrenheit, water temperature of 50.5 degrees Fahrenheit, winds of 20 knots, gusting to 26 knots, and seas of 4.6 to 5.4 feet. *Id.* ¶ 9. The USCG recorded on-scene winds at 30 knots with seas running 6-8 feet. *Id.* The Vessel had survival suits for the crew members and a life raft with hydrostatic release on board. *Id.* ¶ 25. The cause of the sinking remains under investigation by the USCG and National Transportation Safety Board and is otherwise unknown. *Id.* ¶ 10.

For each decedent with minor children, their minor children have cognizable claims. Under Maine law, parents have a duty to support their minor children. 19-A M.R.S. § 2005. Mr. Ward had two minor children, ages 6 and 3 years at the time of his death. *Joint Stip.* ¶ 18. Mr. Blethen had two minor children, ages 14 and 5 years at the time of his death. *Blethen Mem.* at 1-2. Mr. Porper had two minor children, ages 14 and 2 years at the time of his death. *Joint Stip.* ¶ 19. Mr. Matthews had no minor children. *Id.* ¶ 16.

### B.     Alan Steinman, M.D., M.P.H.'s Opinions

The parties provided Dr. Alan Steinman's expert opinion concerning the range of circumstances that most likely occurred to Captain Blethen and Seamen Matthews, Porper, and Ward leading to their deaths. *Joint Stip.*, Attach. 1, *Letter of*

*Alan M. Steinman, M.D., M.P.H. to R. Terrance Duddy, Esq. (Jul. 29, 2021)* (*Steinman Report*).  Dr. Steinman addresses how the human body would have reacted to different scenarios, starting with rapid drowning and ending with drowning after donning a survival suit.  *Steinman Report* at 7-10.  Dr. Steinman's letter makes painful reading.  In Attorney Latti's memorandum in support of the claims of the Estate of Ethan Ward, she accurately writes that "Dr. Steinman's description of what the crewmembers endured physically and emotionally haunts the reader."  *Ward Mem.* at 4.

Other than the inescapable inference that each man drowned, there is no direct evidence as to how he drowned.  Thus, there is no basis for the Court to find that one man outlived another or that one man died more or less painfully than another.  This leads to the conclusion that the Court's awards for conscious pain and suffering must be equal.[4]

The other compelled inference is that each man died an unspeakably tragic and terrible death, each likely aware of his impending death while struggling to survive in a dark, cold, and angry ocean.  Dr. Steinman does not address the conscious pain and suffering that the crew must have experienced as the F/V Emmy Rose ran into trouble and as the crew struggled to maintain the loaded vessel's equilibrium in the face of heavy seas and high winds.  Again, there is no evidence about how the

---

[4]    There is some evidence that if the men did not die quickly, each man's survival time would have depended on his age, height, and weight. *Steinman Report* at 9.  But there is no foundational basis for the Court to make any findings about how long one individual survived as opposed to another. For any individual, it is just as likely that he died shortly after hitting the water as that he donned a survival suit and lived for a few days after the Vessel went down.

Vessel went down and it is possible that it sank suddenly and without warning, but it is more likely that there was some period of panic as the seamen worked in horrific conditions to avoid its and their awful demise.

### C.   Ethan Ward

#### 1.   As a Person and Father

Ethan Ward was twenty-three years old when he died at sea.  *Ward Mem.* at 2.  Though Mr. Ward never married, he was the father of two young children, ages 6 years and 3 years at his death.  *Id.*  He was about 5' 11" tall, weighed about 180-200 pounds, and was in good health.  *Id.*  Mr. Ward was born in Portland, Maine in 1997. *Id.*, Attach. 2, *Ex. B Certificate of Live Birth*.  At age 18, Mr. Ward graduated from the Wayfinder School in New Gloucester, Maine.  *Id.*, Attach. 10, *Ex. J Aff. of Jennifer Ward* ¶ 5 (*Ward Aff.*).  After high school, Mr. Ward worked odd jobs ranging from harvesting wood to construction.  *Ward Aff.* ¶ 6.  About a year after high school, Mr. Ward started working on fishing and lobster boats and in the summer of 2020, he was hired as a crew member on the F/V Emmy Rose.  *Id.* ¶ 7.  Mr. Ward's mother says that he "loved working on fishing boats and his goal was to continue working as a crew member on fishing boats and to eventually become Captain."  *Id.*  Mr. Ward had two children, N.P.W. with Danica Perry and A.W. with Ashley Pepin.  *Id.* ¶ 8.  Both children lived nearby Mr. Ward and Ms. Ward describes her son as a "loving and caring father to his children."  *Id.* ¶ 9.

#### 2.   Child Support for N.P.W. and A.W.

10

In furtherance of his claim for child support for his two minor children, N.P.W. and A.W., Mr. Ward acknowledges that the Court must "examine the loss of earning capacity of the Decedent Ward." *Ward Mem.* at 5. Mr. Ward confirms that he had been working on F/V Emmy Rose for three months before his death, making a total of seven trips, earning a total of $14,717.71. *Id.* Mr. Ward extrapolated these earnings into annual earnings of $58,000 and, using that figure, his economic expert, Dr. Sebastian Lobe, projected his earnings until each of his children reach the age of eighteen. *Id.*

Dr. Lobe first assumed that Mr. Ward would have worked yearly (from September 2020 until August 2021 over 166 days and up to 262 days). *Id.*, Attach. 9, *Ex. I Economic Report on the Value of Basic Child Support Obligations (Sept. 24, 2021)* at 2 (*Lobe Report*). At Attorney Latti's request, Dr. Lobe projected five scenarios of the children's parents' combined annual gross income[5] from $35,000 to $55,000 in $5,000 increments. *Lobe Report* at 2. Applying assumed inflation and reducing the amounts to present value, Mr. Ward requests an award between $86,134 to $121,226 for N.P.W. and between $112,035 to $157,679 for A.W. *Id.* at 8.

### D.    Robert Blethen

#### 1.    As a Person and Father

Born in 1979, Robert W. Blethen, Jr. was a captain and commercial fisherman, who fished out of Portland, Maine and Gloucester, Massachusetts for twenty years before his death on November 23, 2020. *Blethen Mem.* at 1; *id.*, Attach. 1, *Ex. A Aff.*

---

[5]    Dr. Lobe points out that the Maine Schedule of Basic Child Support Obligations is based on the parents' combined annual gross income. *Lobe Report* at 7.

*of Ann Preble* ¶ 2 (*Preble Aff.*).  Mr. Blethen left behind an adult daughter, Taitum-Lynn Rice, and two minor children, H.B. and J.B.[6]  *Blethen Mem.* at 1.  Unfortunately, Mr. Blethen and his daughter H.B., who was fourteen at his death, were estranged. *Id.* at 2.  They had not spoken for at least five years prior to Mr. Blethen's death and Mr. Blethen provided H.B. with no financial support.  *Id.*  H.B.'s mother never pursued child support for H.B. from Mr. Blethen and no child support order was ever entered against him for her support.  *Id.*

Mr. Blethen began a romantic relationship with Ann Preble in 2009 and they were engaged to be married in 2012.  *Id.* at 1.  They produced a son, J.B., who was five years old at the time of the sinking.  *Id.*  Mr. Blethen was a doting father to J.B., an active participant in all aspects of his life, and a consistent financial supporter of his son's needs.  *Id.* at 2.  When Mr. Blethen was not fishing, he was constantly with J.B.  *Preble Aff.* ¶ 9.

### 2.    Child Support for J.B.[7]

In furtherance of his claim for child support for his minor child, J.B., Mr. Blethen relied on his last six years of income.  *Blethen Mem.* at 3.  His economic expert, Dr. Neville S. Lee, arrived at an annual gross income figure of $70,000.  *Id.* Dr. Lee calculates that Mr. Blethen would have earned a net total of $503,000 during the years that J.B. remained a minor.  *Id.*  Using the Maine Schedule of Basic Child

---

[6]    The Joint Stipulation says that J.B. was "2 years, 5 months" at the time of the sinking.  *Joint Stip.* ¶ 17.  This is in error.  *See Preble Aff.* ¶ 8; *Blethen Mem.*, Attach. 1, *Ex. E Certificate of Live Birth of [J.B.].*  The Court uses 5 years and 4 months as J.B.'s age as of November 23, 2020 as confirmed by his birth certificate.

[7]    For reasons explained later, the Court concluded that H.B. is not entitled to a claim of minor support or loss of nurture and the Court is therefore addressing only J.B.'s claim for child support.

Support Obligations, Mr. Blethen's gross annual salary of $70,000 would have been assessed at $212 per week or $9,600 per year, which projected over J.B.'s approximately 12.5 years of remaining minority yields a total pecuniary loss to J.B. of $120,000. *Id.* at 3-4. However, at the Court's request, on December 29, 2021, Mr. Blethen submitted a supplemental report from Dr. Lee, reducing this figure to its present value. *Loss of Support for the Blethen Children* (ECF No. 64). According to Dr. Lee, the present value of the loss of support for J.B. is $110,434. *Id.* at 2.

### E.   Michael Porper

#### 1.   As a Person and Father

Michael Porper was thirty-eight years old when he died at sea on November 23, 2020. *Porper Mem.*, Attach. 5, *Ex. E The Probable Economic Loss in the Event of the Wrongful Death of Mr. Michael Porper, Jr. (Aug. 17, 2021)* at 3 (*Porper Lee Report*). Mr. Porper lived in North Berwick, Maine and fished most often out of Portland, Maine and several times out of Gloucester, Massachusetts. *Porper Mem.* at 1-2.

Mr. Porper had two minor daughters, M.P. and G.P. *Id.* at 1. He was an active participant in the lives of both his daughters. *Id.* at 3. M.P., who was fourteen years old at her father's death, lived in Massachusetts; G.P., who was two years old, lived with him and his fiancée Ashley Gross. *Id.* at 1-3. There was an active support order against Mr. Porper in which he was required to pay $80 per week to Holly O'Connor, the mother of M.P. *Id.* at 3. Mr. Porper was also subject to a December 31, 2019 court order, requiring him to pay $27,185.67 in child support arrearages to Ms. O'Connor. *Id.*

### 2.    Child Support for M.P. and G.P.

In furtherance of his claim for child support for his two minor children, M.P. and G.P., Mr. Porper relied on his last six years of income. *Porper Lee Report* at 3. Mr. Porper had a reported income of $22,481 in 2020 or $25,093 on a full-year basis. *Id.* at 4. Mr. Porper takes the amount that he was legally required to pay annually for child support for M.P., $4,180, and multiplies that figure by the 8.5 years until her emancipation for a total of $66,225.67, to which he added the $27,185.67 owed in arrearages. *Porper Mem.* at 8. As to G.P., using the Maine Schedule of Basic Child Support Obligations, Mr. Porper's gross annual salary would have been assessed at $5,980 per year, which projected over G.P.'s 15.5 years of remaining minority yields a total pecuniary loss to G.P. of $92,690. *Id.* At the Court's request, on December 30, 2021, Mr. Porper submitted a supplemental report from Dr. Lee, reducing these figures to their present value. *Pl.'s, Ashley Gross as the Representative of the Estate of Michael J. Porper, Jr., Suppl. to Consent J. Hr'g Mem. Pursuant to the Ct.'s Order to Suppl., Doc. 63* (ECF No. 65), Attach. 1, *Estate of Porper Consent J. Mem (Dec. 28, 2021)*. According to Dr. Lee, the present value of the loss of support is $60,599 for M.P. and $82,881 for G.P. *Id.* at 2.

### F.    Jeffrey Matthews

"The person suffers most who has the most to lose. In the case of Jeff Matthews, Sr., there was much that he had to live for and therefore much that he had to lose." *Matthews Mem.* at 7. Jeffrey Matthews was 55 when he died at sea on November 23, 2020. *Id.*, Attach. 3, *Obituary: Jeffrey Matthews* at 1. His obituary

describes a man who was "above all things . . . a family man." *Id.* Mr. Matthews spent over thirty-five years as a commercial fisherman and fishing was "his life and soul." *Id.* He was a "hard-working, old-school fisherman." *Id.* When not at sea, he was "surrounded by his family," which included his three children, all adults: Racquel Matthews, Jeff Matthews, and Reyann Matthews. *Id.* He was also survived by his mother, Sandra Schiefer, siblings, and three grandchildren, A.J., Alexis, and Camden. *Id.*

## IV.   DISCUSSION

### A.   The Interrelationship of the Claims

The two categories of damages have different repercussions. The surviving tort claim is a claim by the decedent's estate and its distribution will be in accordance with the law of intestacy.[8]   Under 18-C M.R.S. § 2-103(1)(A), where there is no surviving spouse, the "entire intestate estate" passes first to "the decedent's descendants per capita at each generation." As none of the decedents was married at his death, each child, whether adult or minor, of each estate would receive the same share.[9]

The pecuniary loss claims, both for lost child support and for nurture and guidance, are claims only on behalf of the decedents' minor children and for losses during their minority. As the insurance proceeds are limited to $960,000, the greater

---

[8]   The parties have not mentioned that any of the decedents had a will and the Court assumes there were none and that intestacy law controls. *See* 18-C M.R.S. § 2-103 ("[T]he entire <u>intestate</u> estate if there is no surviving spouse, passes in the following order . . . .") (emphasis supplied). Whether the decedents were testate or intestate does not affect this Court's ruling.

[9]   This does not mean that each child across the claimants would receive the same amount because the intestacy law requires a per capita distribution.

the award for pain and suffering to the estates, the more available to all children, adult and minor, and the less available to the minor children alone, and the converse is true, the less the pain and suffering award, the more available to the minor children.  Finally, three of the decedents had minor children; Mr. Matthews did not. Unique among the four decedents, therefore, his claim is restricted to an award for conscious pain and suffering to be divided among his adult children.

### B.   Equitable Distribution

In *Uncle Sam*, the United States District Judge faced a situation much like this case, where the total damages vastly exceeded the available insurance coverage. 928 F. Supp. at 65-66 (discussing equitable proration of limited funds).   To be fair to all claimants in *Uncle Sam*, the District Judge "ordered an equitable allocation of the available funds among the four estates, taking into account the survivors' respective pecuniary losses, as well as the pain and suffering of the decedents before their deaths." *Curcuru v. Rose's Oil Serv.*, 66 Mass. App. Ct. 200, 202, 846 N.E.2d 401 (Mass. App. Ct. 2006).

In this Order, this Court attempted to make an equitable distribution, aware that the claimants' total damages substantially exceed the available insurance coverage.  In making the conscious pain and suffering awards, the Court considered that Congress has expressed a policy that the seamen's estates should be properly compensated for conscious pain and suffering leading to their deaths.  At the same time, the Court has taken into account that Congress also recognized that seamen's minor children are especially vulnerable because they have lost their parents'

16

financial support and, unlike adult children, are incapable of replacing that pecuniary support on their own.   The Court has considered both underlying congressional policies.

### C.        Conscious Pain and Suffering Award

The claimants take different positions concerning the amount the Court should award for conscious pain and suffering.  Mr. Ward urges an award of $500,000.  *Ward Mem*. at 4.  Mr. Blethen does not suggest a figure, only that his estate should be awarded an equal amount to the other estates.  *Blethen Mem*. at 4-5.  Mr. Porper suggests an award of $259,168.  *Porper Mem*. at 12.  Mr. Matthews suggests an award of $200,000.  *Matthews Mem*. at 8.

Each of these proposed awards is defensible.  However, an award as high as $500,000 for each seaman would drive down the awards available to the minor children for loss of support and nurture.  The Court acknowledges that in making an award to an estate, the proceeds will go to the decedent's children, both adult and minor, and in making an equitable division, the Court is cognizant that each of the adult children has lost a father and deserves compensation under the law.  At the same time, as just discussed, Congress has provided a special claim for the minor children against the available proceeds presumably because they cannot fend for themselves.

In a situation where the available assets exceeded the combined awards, the tension between the awards for the estates and the awards for the minor children would not matter, but here, the available insurance proceeds are finite and there is a

17

direct relationship between the awards for conscious pain and suffering and the net amounts available for pecuniary loss. The Court calculated different conscious pain and suffering awards to assess their impact on the money available to the minor children. Balancing all these considerations, the Court awards the following for conscious pain and suffering to each estate:

1) Estate of Ethan Ward: $200,000;

2) Estate of Robert Blethen: $200,000;

3) Estate of Michael Porper: $200,000;

4) Estate of Jeffrey Matthews: $200,000.

**D.    Child Support**

Although both Maine and Massachusetts allow a support obligation to persist beyond age eighteen if certain conditions are met, for purposes of this Order, the Court finds that the support obligations of Mr. Blethen, Mr. Porper, and Mr. Ward would have terminated when each child reached the age of eighteen. Even though it is statistically possible that their support obligations could have extended longer under Maine and particularly under Massachusetts law, to conclude that any of these men would have been required to pay child support beyond the age of eighteen is too speculative on this record to justify an award beyond each child's date of majority.

Each of the parties with minor children supplied present value estimates of their future losses based on the state of Maine's child support schedules. For some claimants, there is evidence they might have made child support payments exceeding the Maine schedules and, by the same token, as Mr. Matthews points out in his reply,

18

there are unanswered questions about other factors, such as the mother's income, the payment of health insurance, and other government support. *Matthews Reply* at 2-5.

In an effort to equitably distribute limited funds, the Court relied upon the Maine schedules to fix the present value of the decedents' respective child support obligations. To do otherwise would require more extensive factfinding than the record allows, and the Court concludes this is the fairest approach across the families of the three claimants with minor children. *See Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir. 1982) ("Although damages need not be proved to a mathematical certainty, 'sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture'") (quoting *Rochez Bros. v. Rhoades*, 527 F.2d 891, 895 (3d Cir. 1975)).

In his memorandum, Mr. Blethen concedes that he and H.B. were "estranged at the time of [his] death and had not spoken for at least five years prior to [his] death." *Blethen Mem.* at 2. "During this time, Blethen provided H.B. with no financial support." *Id.* "H.B.'s mother never pursued child support from Blethen for H.B., and no child support order was ever entered against Blethen regarding H.B." *Id.*

In these circumstances, even though the result is harsh for H.B., the Court must conclude that H.B. is not entitled to a loss of support award because there is no evidence in this record that Mr. Blethen would have supported H.B. had he lived. Recovery under DOHSA for loss of support "includes all the financial contributions

that the decedent would have made to his dependents had he lived." *Sea-Land Servs., Inc.*, 414 U.S. at 584-85.  Thus, "recovery for loss of support requires some showing of dependence on the deceased or an expectation of support." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1350 (9th Cir. 1987).  "The measure of recovery under Section 2 of DOHSA is the actual pecuniary benefits that the decedent's beneficiaries could reasonably have expected to receive from the continued life of the decedent." *Solomon v. Warren*, 540 F.2d 777, 786 (5th Cir. 1976).  As there is no evidence in this record that Mr. Blethen would have supported a daughter he had not spoken to and not supported for five years, the Court excluded H.B. from its loss of support calculations.

The same does not apply to Mr. Porper's now fifteen-year-old daughter, M.P. Mr. Porper had two daughters with two different mothers.  Unlike Mr. Blethen's relationship with H.B., according to M.P.'s mother, Mr. Porper was "an involved and attentive father to our daughter, M.P." *Porper Mem.*, Attach. 8, *Aff. of Holly O'Connor* ¶ 7.  It is true that Mr. Porper had failed to pay ordered child support for M.P.; however, the record reveals that Ms. O'Connor was pressing in Massachusetts court for payment of his arrears and on December 31, 2019, a Massachusetts court had held Mr. Porper in contempt for his failure to maintain child support for M.P.  *Id.*, Attach. 8, *Ex. E Commonwealth of Mass.*, *The Trial Ct.*, *Probate and Family Ct. Compl. for Contempt (Dec. 31, 2019)*.  Indeed, on October 21, 2020, the Massachusetts Court held a conference and Mr. Porper failed to attend.  *Id.*  The Massachusetts Court ordered a capias to issue.  *Id.*  Based on the contents of this Order and Mr. Porper's continuing relationship with M.P., this Court concludes that M.P. had a "reasonable expectation

of support" from Mr. Porper sufficient for an award under DOHSA. *Bergen*, 816 F.2d at 1350.  To rule otherwise would be to act in derogation of the Massachusetts Court's order and to allow Mr. Porper to flout in death what he judicially owed but did not pay in life.

By contrast, the Court does not accept Mr. Porper's assertion that the Court should include his child support arrearages, in the amount of $27,185.67, in its award for child support for M.P.   In Mr. Porper's memorandum, he described the Massachusetts Court order dated December 31, 2019, holding him in contempt and ordering the payment of $27,185.67.  *Porper Mem.* at 3.  Mr. Porper's child support demand for M.P. included this $27,185.67 arrearage figure plus $3,680 in additional arrearages incurred between December 2019 and November 23, 2020.  *Id.* at 8 ("Since November 23, 2020 (the date of presumed death), Mr. Porper would have been obligated to pay an additional eight years, six months of support at $4,180/year, totaling $35,360 through the age of his eldest daughter's emancipation.  This child support number does not include the $27,185.67 in arrears through December of 2019, nor the $80 per week between December of 2019 and November 23, 2020 (46 weeks) totaling $3680, nor health insurance, nor any household services, nor tuition for post-high school education, nor miscellaneous support such as clothing, birthday gifts, Christmas gifts, etc.  On child support alone, M.P. has sustained damages in the amount of ***$66,225.67***") (bold type in original).  Dr. Lee recalculated the present value of the $66,225.67 to equal $60,599, but unfortunately, Dr. Lee's supplemental

calculation of the present value of the child support claim for M.P. embedded the $30,865.67 arrearage figure in the total present value of $60,599.

In Mr. Ward's reply brief, he objected to the inclusion of child support liens as a part of Mr. Porper's child support claim in this case, asserting that "[c]hild support liens are a debt of the Estate and should not be calculated in allocating the insurance proceeds to each Estate." *Ward Reply* at 1.

Neither Mr. Porper nor Mr. Ward cites any authority for their conflicting legal positions. Despite the lack of guidance, the Court concludes that Mr. Ward's position is sounder. The Court bases its conclusion on the premise of an action for damages under DOHSA, namely that the survivors are entitled to pecuniary loss caused by the death. *Uncle Sam*, 928 F. Supp. at 66 ("Under both the Jones Act and the [DOHSA], recoverable damages are limited to (1) an award for the conscious pain and suffering of the decedent before his death, and actual pecuniary loss of the survivors as a result of his death") (emphasis in original). As the child support arrearages that Mr. Porper owed M.P. before his death were not "actual pecuniary loss . . . as a result of his death," the Court concludes they are not a proper measure of child support damages under DOHSA.

This leaves a net future child support figure under DOHSA for M.P. of $29,733.33 ($60,599 - $30,865.67). As the Court subtracted the $30,865.67 from the present value figure of $60,599, if there is a difference between the present value figure calculated by Dr. Lee and the net awardable figure, it would seem de minimis.

Based on these principles, the Court awards the following amounts for loss of support:

1) N.P.W: $86,134;

2) A.W.: $112,035;

3) J.B.: $110,434;

4) G.P.: $82,881;

5) M.P.: $29,733.

### E.    Loss of Nurture

Like loss of support, a child's loss of nurture is compensable under DOHSA. *Sea-Land Servs.*, 414 U.S. at 585.  "It is important to emphasize, however, that a child's claim for loss of nurture is limited to the pecuniary value of the services the deceased parent would have provided and cannot include damages for the emotional loss of growing up without a father."  *Brown v. United States*, 615 F. Supp. 391, 400 (D. Mass. 1985).  "Under DOHSA, however, the wrongful death of a parent standing alone is an insufficient predicate to support recovery by a child of the loss of parental nurture, and in order to recover this item of damages the evidence must show that the deceased parent was fit to furnish such training and that training and guidance had actually been rendered by the parent during his or her lifetime to their children."  *Solomon*, 540 F.2d at 788.  Although the First Circuit has not spoken directly on this issue, the Second Circuit listed the factors to be considered, including "the age, character, earning capacity, health, intelligence, and life expectancy of the decedent. . . as well as the degree of dependency of the distributees upon the decedent and the

probable benefits they would have received but for the untimely death." *McKee v. Colt Electronics Co.*, 849 F.2d 46, 52 (2d Cir. 1988). Although there is no bar to a loss of nurture award for an adult child, "courts reviewing jury awards for loss of parental guidance have generally reduced awards to adult children to a fraction of the amount recoverable by infant children." *Mono v. Peter Pan Bus Lines*, 13 F. Supp. 2d 471, 477 (S.D.N.Y. 1998); *see Solomon*, 540 F.2d at 789-90.

Courts have frequently awarded sums equal to $5,000 to $15,000 per year for loss of nurture. *See In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 187 (S.D.N.Y. 2013) (collecting cases). In performing this analysis, it is proper to consider "the frequent absences that [the decedent's] occupation as a fisherman would have necessitated." *Brown*, 615 F. Supp. at 400.

Here, Mr. Ward requested that the Court award his children between $12,000 and $22,000 annually until they reach the age of 21. *Ward Mem.* at 9. The Court declines to do so. In *Zilko v. Golden Alaska Seafoods, Inc.*, 123 Wash. App. 1020, at *29 (Wash. Ct. App. 2004), the appeals court noted that to sustain an award beyond the age of 18, the claimants would have to present "specific facts or circumstances that justified extending the loss of nurture damages beyond age 18." Here, the claimants have not pointed to any evidence that would provide a rationale for an award for nurture beyond each child's age of majority. *See* 1 M.R.S. § 73 ("The common law rule that a person is a minor to the age of 20 is abrogated and persons 18 years of age or over are declared to be of majority for all purposes"); MASS. GEN. LAWS ch. 4, § 7 ("Forty-eighth, 'Minor' shall mean any person under eighteen years of

age"); *see Brown*, 615 F. Supp. at 400 (limiting the nurture award to last "until [the child] attains the age of 18").

For the same reasons the Court discussed regarding child support, the Court declines to award H.B. an amount for loss of nurture.  Mr. Blethen's argument is that "although [H.B.] had been estranged from her father for a number of years, the death of one's biological father as a teenager is an inherently traumatic event." *Blethen Mem.* at 4.  "H.B. has further suffered the loss of the opportunity to reconnect and build a stronger relationship with her father." *Id.*  The Court accepts these asserted facts as true, but a nurture award is a pecuniary award, not an award for loss of society.  *Brown*, 615 F. Supp. at 400 ("loss of society is not recoverable under DOHSA").  There is no evidence in this record that allows the Court to conclude that it is more likely than not that Mr. Blethen would have furnished training and guidance to H.B. for the rest of her minority.

For each child, except H.B., the Court awards $5,000 per year for loss of nurture, up until they turn eighteen.[10]  This results in the following loss of nurture awards:

1) NPW: 12 years at $5,000 per year = $60,000;

2) AW: 15 years at $5,000 per year = $75,000;

3) J.B.: 13 years at $5,000 per year = $65,000;

4) G.P.: 16 years at $5,000 per year = $80,000;

---

[10]     The Court acknowledges that these figures are not reduced to present value.  But given the unique posture of this case, where there is a limited amount of available insurance, the record allows the Court to apply the same standard among all the minor children and a reduction to present value of these figures would not have a significant impact on the ultimate allocation.

5) M.P.: 4 years at $5,000 per year = $20,000.

### F.   Funeral Expenses

One potential element of pecuniary loss under DOSHA is funeral expenses. *In re Adventure Bound Sports*, 858 F. Supp. at 1197.  Only Mr. Porper has made a claim for funeral expenses. *Porper Mem.* at 9-10.  Mr. Porper proposes that the Court issue a funeral expense award, not based on his funeral, but on the average cost of a funeral in Massachusetts and Maine. *Id.*  On this basis, he seeks $10,000. *Id.*  One of the tragedies of the sinking of the F/V Emmy Rose, however, is that the bodies of the four men were never found. *Joint Stip.* ¶ 12 ("The USCG issued a Presumption of Death letter for each of the four men aboard the Vessel, identifying November 23, 2020 as the date of death").  Therefore, there is no basis to apply a traditional funeral service expense to the tragic circumstances of Mr. Porper's death.

Alternatively, Mr. Porper's fiancée Ashley Gross attended a group service in Portland, Maine and she submitted out of pocket expenses in the amount of $597.40 that she incurred for flowers and lodging to attend that service. *Porper Mem.*, Attach. 4, *Ex. D.*  In *Sea-Land*, the United States Supreme Court wrote that "funeral expenses are compensable."  414 U.S. at 591; *but see Barbe v. Drummond*, 507 F.2d 794, 801-02 (1st Cir. 1974) (finding that funeral expenses are not a recoverable pecuniary loss under DOHSA if paid by the decedent's estate rather than by the decedent's dependents).

As *In re Adventure Bound Sports* observed, funeral expenses traditionally represent such items as the payment for a "funeral service, funeral plot, and burial."

858 F. Supp. at 1202.  Flowers at a funeral are reasonably deemed a funeral service expense.  *See Smith v. Bauknecht*, 2011 Ohio 4046, ¶ 20, 2011 Ohio App. LEXIS 3391, at *4-5 (Ct. of App. Ohio, Sixth App. Dist., Lucas Cnty. Aug. 12, 2011) (concluding that under Ohio law the provision of funeral flowers is a necessary funeral expense).  But the Court is skeptical that the concept of funeral expenses can be stretched to include lodging for family members to attend the funeral.  Mr. Porper has not cited any caselaw that extends the reach of funeral service expenses to cover the lodging expenses of the attendees.  Accordingly, the Court allows $156[11] for flowers but not $441.22 for people to stay at a hotel to attend the funeral service.

In his memorandum, Mr. Porper mentions that Ms. Gross and his counsel have continued to work with municipal representatives of the city of Gloucester, Massachusetts and private partners to include his name on Gloucester's famous memorial to "They that go down to the sea in ships," also known as "The Man at the Wheel" or "The Fisherman's Statue."  *Porper Mem.* at 5.  Mr. Porper does not, however, provide the cost, if any, of this inclusion and of a related future private memorial service and does not contend that the inclusion may be considered a funeral expense.

## G.    Total Awards

Based on these principles, the Court awards the following damages to the Estates for conscious pain and suffering:

1) Ethan Ward: $200,000;

---

[11]    For ease of calculation, for any figure calculated to the cent, the Court rounded down to the nearest dollar.

2)  Robert Blethen: $200,000;

3)  Michael Porper; $200,000;

4)  Jeffrey Matthews: $200,000

5)  Total conscious pain and suffering award: $800,000.

The Court also awards the following damages to the dependent minor children for pecuniary loss, child support, and loss of nurture:

1)  N.P.W: $86,134 + $60,000 = $146,134;

2)  A.W.: $112,035 + $75,000 = $187,035;

3)  J.B.: $110,434 + $65,000 = $175,434;

4)  G.P.: $82,881 + $80,000 = $162,881;

5)  M.P.: $29,733 + $20,000 = $49,733;

6)  Total of all pecuniary loss awards except funeral expenses: $721,217

Finally, the Court awards Ashley Gross $156 for funeral expenses.

## V.   ALLOCATION OF AWARDS

To arrive at the final allocation, the Court has calculated the total amount of the awards and has reduced each award by the percentage the available insurance coverage of $960,000 represents to the full amount of the awards.  Here, the total amount of all the awards equals:

1)  Conscious pain and suffering awards: $800,000;

2)  Pecuniary Loss, including funeral expenses: $721,373;

3)  Total awards: $1,521,373

4)  Percentage of available coverage against the total award:

$960,000 ÷ $1,521,373 = 63.1\%$.

Applying this percentage to the individual awards, the Court arrives at the following:

A. Conscious Pain and Suffering: $504,800

    1) Ethan Ward: $200,000 x 63.1% = $126,200;

    2) Robert Blethen: $200,000 x 63.1% = $126,200;

    3) Michael Porper; $200,000 x 63.1% = $126,200;

    4) Jeffrey Matthews: $200,000 x 63.1% = $126,200.

B. Loss of Support: $265,785

    1) N.P.W: $86,134 x 63.1% = $54,350;

    2) A.W.: $112,035 x 63.1% = $70,694;

    3) J.B.: $110,434 x 63.1% = $69,683;

    4) G.P.: $82,881 x 63.1% = $52,297;

    5) M.P.: $29,733 x 63,1% = $18,761.

C. Loss of Nurture: $189,300

    1) N.P.W: $60,000 x 63.1% = $37,860;

    2) A.W.: $75,000 x 63.1% = $47,325;

    3) J.B.: $65,000 x 63.1% = $41,015;

    4) G.P.: $80,000 x 63.1% = $50,480;

    5) M.P.: $20,000 x 63.1% = $12,620.

D. Funeral Expense: $98

    1) Ashley Gross: $156 x 63.1% = $98.

This results in the following total net awards by category:

    A.  Conscious Pain & Suffering:  $504,800

    B.  Loss of Support:          $265,785

    C.  Loss of Nurture:           $189,300

    D.  Funeral Expense:        <u>$        98</u>

    E.  Total:                  $959,983

To reach the total amount of available insurance coverage of $960,000, the Court distributed the remaining seventeen dollars equally to each category with the extra three dollars going to funeral expenses as follows:

    E.  Conscious Pain and Suffering: $504,804

        1) Ethan Ward: $200,000 x 63.1% + $1 = $126,201;

        2)  Robert Blethen: $200,000 x 63.1% + $1 = $126,201;

        3)  Michael Porper; $200,000 x 63.1% + $1 = $126,201;

        4)  Jeffrey Matthews: $200,000 x 63.1% + $1 = $126,201.

    F.   Loss of Support: $265,790

        1) N.P.W: $86,134 x 63.1% + $1 = $54,351;

        2)  A.W.: $112,035 x 63.1% + $1 = $70,695;

        3)  J.B.: $110,434 x 63.1% + $1 = $69,684;

        4)  G.P.: $82,881 x 63.1% + $1 = $52,298;

        5)  M.P.: $29,733 x 63,1% + $1 = $18,762.

    D)  Loss of Nurture: $189,305

        1)  NPW: $60,000 x 63.1% + $1 = $37,861;

        2)  AW: $75,000 x 63.1% + $1 = $47,327;

     3)  J.B.: $65,000 x 63.1% + $1 = $41,016;

     4)  G.P.: $80,000 x 63.1% + $1 = $50,481;

     5)  M.P.: $20,000 x 63.1% + $1 = $12,621.

   D. Funeral Expense: $98

     5)  Ashley Gross: $156 x 63.1% = $98 + $3 = $101.

This results in the following final total net awards by category:

   F.  Conscious Pain & Suffering:  $504,804

   G.  Loss of Support:          $265,790

   H.  Loss of Nurture:          $189,305

   I.  Funeral Expense:          $    101

   Total:                   $960,000

## VI.  CAPPING AWARD, THIRD-PARTY ACTIONS, AND MINOR APPROVAL

### A.  Capping Award

The parties entered into a stipulation whereby in exchange for BAM's acquiescence, the claimants have agreed to accept the insurance proceeds in exchange for an order releasing Boat Aaron & Melissa, Inc. and its officers, directors, employees, and agents from further liability. *Joint Stip.* ¶¶ 21-22. Pursuant to the stipulation of the parties, the Court ORDERS:

The Consent Judgment shall be entered capping Boat Aaron & Melissa, Inc., its officers, directors, employees, and agents, including but not limited to Bartley McNeel and Newbold Rink Varian III, liability to the value of the available insurance proceeds and nothing more. The express representations that there is no additional

insurance coverage on the Vessel beyond the $1,000,000 draw down policy made by Boat Aaron & Melissa, Inc. in its affidavit of Newbold Rink and Bartley McNeel,[12] dated October 7, 2021, are material terms of the settlement relied upon by the Defendants.  That is to say that the Defendants in this Limitations Action would not have collectively agreed to resolve the matter for the remaining amount in the draw down policy if more insurance coverage had been available.  The parties agree that this settlement and consent judgment include the relinquishment of rights to pursue any other assets of Boat Aaron & Melissa, Inc. and its officers, directors, employees, and agents including but not limited to Bartley McNeel and Newbold Rink Varian III.

## B.    Third-Party Actions

The Court further ORDERS that this Consent Judgment extends only to the parties to the judgment.  The Court acknowledges that the amounts awarded for conscious pain and suffering to the estates of each of the decedents do not make any of these estates whole and the Court has exercised its equitable discretion in fixing the conscious pain and suffering damages to allocate among the categories of damage in light of the limited insurance coverage.  Specifically, this Consent Judgment does not affect the estates' and the minor children's rights to pursue any other responsible party for additional damages.

## C.    Minor Approval

---

[12]    In its second reference to Mr. McNeel, the Stipulation spells his first name, Barley.  *Joint Stip.* ¶ 22.  The Court has assumed that the first spelling of Bartley is correct.

The parties acknowledge that as it affects minors, the terms of this Consent Judgment must be approved by the Court pursuant to District of Maine Local Rule 41.2. The Court directs the applicable attorneys to expeditiously prepare and file appropriate documents to meet the requirements of Local Rule 41.2.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of January, 2022